# CHARLESTON

HEADLEY *v.* HOOPENGARNER, *et al.*

Submitted June 8, 1906.    Decided November 27, 1906.

1. LANDLORD AND TENANT—*Lease—Construction.*

The word "grant," "demise" or "lease," in a lease for years, creates a covenant in law for good title and quiet enjoyment of the lands demised, during the term.    (p. 631.)

2. MINES AND MINERALS—*Oil and Gas Lease—Construction.*

The ordinary oil and gas lease, giving the lessee, for a term of years the right to mine and operate for oil and gas, is not a sale of the oil and gas in place, and the lessee has no vested estate therein until it is discovered; but when found, the right to produce becomes a vested right, and when extracted, the title vests in the lessee, and the consideration or royalty paid for the privilege of search and production, is rent for the leased premises. (p. 635.)

3. SAME—*Rent—Royalty.*

When a lease is given for the purpose of mining and operating for oil, in consideration of one-fifth of one-eighth of all the oil produced being delivered to the lessor as royalty; and, where, in a division order executed by all the interested parties, fixing and defining their relative interests in the oil produced, the lessor agrees to accept one-fifth of one-sixteenth, and directs the delivery to him of that amount as his portion, he will be estopped to claim more than that amount, as against the parties to said agreement, and those acquiring interests in the lease subsequently thereto. (p. 639.)

4. GUARDIAN AND WARD—*Sale of Ward's Land—Rights of Purchaser.*

Where, in a summary proceeding instituted under chapter 83, Code, for the purpose of selling the undivided interests of infants to the oil and gas in certain lands inherited by them from their father, one purchases the interests of the infants sold thereunder, and agrees to pay a stipulated royalty therefor, he will not be relieved from the payment of such royalty, after the sale is confirmed and deed made, on the ground that the father, in his lifetime, disposed of one-sixteenth of all the oil and gas produced on said lands; nor can such proceedings be re-opened and corrected, but they are final and conclusive upon all the parties thereto, except for after-discovered mutual mistake of material facts, or fraud, and, where relied upon, such mistake or fraud must be clearly and distinctly alleged and proved.    (p. 641.)

5. SAME—*Title Acquired.*

A summary proceeding for the sale or lease of infants' lands, under chapter 83, Code, is a judicial proceeding, and the maxim, *caveat emptor,* strictly applies thereto.    The court sells *only the title, such as it is,* of the parties to the suit, and it is the duty of the purchaser to ascertain for himself whether the title of those parties may not be impeached or superseded by some other and paramount title.    And the purchaser will not be relieved from his purchase, nor from paying the purchase money, though he has acquired no valid title to the land so purchased.    (p. 641.)

6. SAME—*Liabilities of Purchaser.*

Where, under such summary proceedings, the purchaser, by the terms of the decree and deed, is required to pay to the infants four-fifths of one-eighth of all the oil produced, and the guardian, in their behalf, signs division orders directing that one-half of that amount be delivered to him as the share of the infants, and, in compliance therewith, that amount is delivered to and accepted by the guardian for several years without demanding the full share of his wards, this will not estop the infants from claiming that part of the oil which the guardian did not receive.    Nor will those infants who have continued to receive the oil in the same proportion since their majority, be estopped from claiming their full share.    (p. 643.)

7. INFANTS—*Estoppel.*

While the doctrine of estoppel *in pais* applies to infants of years of discretion, for intentional fraudulent conduct, in favor of one who is misled thereby, yet estoppel by contract and for mere silence does not apply to them.    (p. 643.)

8. GUARDIAN AND WARD—*Unauthorized Acts of Guardian.*

The acts of a guardian, without authority and in excess of his powers, with reference to his ward's estate, do not operate as an estoppel against the infants.    (p. 644.)

9. MINES AND MINERALS—*Oil Lease—Forfeiture.*

In a deed made by a guardian conveying the oil and gas in certain lands of his wards, it is provided that the lessees, among other things, shall deliver as royalty to the infants, or their guardian, in tanks or pipe lines free of cost to them or their guardian, the proportionate share of the one-eighth of all the oil produced and saved from the undivided interest of the infants in the land sold; and it is further provided that if the purchaser fails to comply with and do and perform all the things required by him to be done and performed, or any of them, then from the time of so failing to perform the same, or any of them, all rights, estates, interests and privileges under the decree and sale shall become forfeited and revert to the infants.    *Held:* That under the facts of this case there was no forfeiture and reversion, and the action of ejectment was properly enjoined.    (p. 646.)

Appeal from Circuit Court, Tyler County.

Bill by Mansfield Headley against H. L. Hoopengarner and others. Decree for plaintiff, and defendant the Colonial Oil Company and others appeal.

*Reversed. Remanded.*

VAN WINKLE & AMBLER, W. N. MILLER, A. B. & R. F. FLEMING, and C. POWELL, for appellants.

J. H. STRICKLING and K. C. MOORE, for appellee.

SANDERS, JUDGE:

This is a suit in equity, brought in the circuit court of Tyler county, by Mansfield Headley against H. L. Hoopengarner and others. Upon a final hearing, the court below decreed for the plaintiff, and from this decree an appeal has been allowed.

Thomas J. Headley, the father of Mansfield Headley, was the owner, in his life time, of two contiguous tracts of land, in Tyler county, containing twenty-four and forty-six acres, respectively. On the 6th day of February, 1896, Thomas J. Headley and his wife granted to the South Penn Oil Company one-half of the oil and gas within and underlying the forty-six acre tract of land, and on the 14th day of April, 1897, said Thomas J. Headley and wife granted to L. R. Loomis one-half of the oil and gas within and underlying the twenty-four acre tract of land. Both of these grants were recorded in the clerk's office of the county court of Tyler county—the one to the South Penn Oil Company on the 1st day of April, 1896, and the one to Loomis on the 14th day of April, 1897.

Thomas J. Headley died, intestate, soon after the execution of the grant to Loomis, leaving surviving him his widow, Mary Jane Headley, and five children, Mansfield, Elisha, Albert, Florence, and Susannah, infants. Mansfield became of age on March 17, 1899.

Elisha LeMasters was appointed guardian of the infants, and on the 17th day of March, 1899, as such guardian, he united with Mary Headley, the widow, and Mansfield Headley, the adult, in a lease to H. L. Hoopengarner, M. W. Wharton and S. A. Karnes & Co., leasing for oil and gas these two tracts of land. Inasmuch as the guardian had no

authority to make it, this lease was ineffective to pass the interest of the infants, and on the 8th day of August. 1899, the said guardian filed his petition in the circuit court, reciting, among other things, the execution of the lease by the widow, the adult, Mansfield, and petitioner as guardian of the infants, and filed the lease as an exhibit with his petition. It set out the advantage it would be to the infants to sell or lease their interest in and to the "undivided seven-eighths of all the oil and of all the gas within and underlying said tract of land," reserving unto said infants their proportionate share of the one-eighth royalty of oil not sold, and prayed for authority to make such sale. On the same day the court entered a decree authorizing said sale, and the guardian reported that he had sold, at private sale, the undivided interest of the infants in and to the undivided four-fifths of the seven-eighths of all the oil and of all the gas within and underlying said tract of land, to the original lessees, Hoopengarner, Wharton, Karnes & Co., and the court entered a decree confirming the sale. On the same day, the guardian made a deed to the purchasers for the oil and gas sold.

By various assignments, the undivided seven-eighths working interest came, on the 23rd day of April, 1900, into the hands of N. S. Snyder and W. L. Mellon, and they were the owners of such working interest when, in that month, oil was first struck on the twenty-four acres. The interests which the South Penn Oil Company and Loomis had acquired by their conveyances from the ancestor, Headley, and his wife, had never been discovered by the lessees, and, consequently, had never been taken into account by them, until they came to divide the royalty interest in the oil. Oil being struck first on the twenty-four acres, the question arose as to what interest Loomis owned, and a division order was agreed upon, signed by Mansfield Headley, Elisha LeMasters, guardian, N. S. Snyder, L. R. Loomis and W. L. Mellon, giving to Mansfield Headley one-eightieth of the royalty; to LeMasters, four-eightieths, and to Loomis, five-eightieths, thereof, and to Snyder and Mellon the seven-eighths working interest. Later, oil was discovered on the forty-six acres, and another division order was agreed upon, identical with the first, with the exception that the South Penn Oil

Company received the five-eightieths royalty. On the 21st day of December, 1900, Snyder and Mellon assigned the whole of the working interest to Henry Goodkind and Philip Kleeberg, and on the 2nd day of January, 1902, Goodkind & Kleeberg assigned the same to the Colonial Oil Company.

The operators of the leasehold divided the royalty as stip-ulatde in the division orders until some time in July, 1903, when Mansfield Headley instituted his suit in chancery against the lessees and their assigns, claiming that inasmuch as the original lease reserved one-eighth royalty, and as it was void as to the infants, the entire one-eighth should be accounted for to him alone. At the same time, LeMasters, guardian of the infants, two of whom had, in the meantime, become of age, and the two thus becoming of age, instituted their suit in ejectment against the Colonial Oil Company, which was then in possession of the property, to recover possession of the same. This suit was based on the theory that the decree in the summary proceeding case required the purchasers to pay four-fifths of the royalty oil to the guardian, and provided that a failure to comply with the terms of the lease should operate a forfeiture; and that, in-asmuch as the purchasers had paid only two-fifths, the right, title and interest of the infants should revert back to them.

The Colonial Oil Company, Goodkind and Kleeberg filed their answer and cross-bill to the bill of Mansfield Headley, in which they set up the lease executed by Mansfield Head-ley and others, and the summary proceeding case, and insist that under the lease Mansfield Headley was entitled to one-fifth of the royalty, and the infants to four-fifths thereof, subject to the widow's dower; and they plead the lease and record in the summary proceeding case as an estoppel; they also plead the division orders signed by Mansfield Headley as an estoppel, and ask by way of affirmative relief that all questions be settled, and that the ejectment suit be enjoined. An injunction was granted. Answers were filed by South Penn Oil Company, Eureka Pipe Line Company, Snyder & Mellon, and the guardian, LeMasters, and his former wards, Albert and Florence. Depositions were taken, and on the final hearing, the court decreed that the

lessees should account to the heirs for the full one-eighth royalty.

The questions to be determined are: first, are the Headley heirs entitled to participate in the full one-eighth royalty; and, second, are the lessees and their assigns liable to account for the additional one-sixteenth of the oil over and above the one-sixteenth that has gone to the Headley heirs, and in addition to the one-sixteenth which has been given to the grantees of the ancestor, Headley.

It is contended by plaintiff's counsel that there is no implied covenant of warranty in an oil and gas lease. This is based upon the theory that the lease from the Headley heirs to Hoopengarner, Wharton, Karnes & Co. was a sale of the oil in place, and passed a fee simple estate, and not merely a lease or rental contract. If this claim were correct, and had it been a grant of the oil in place, creating an estate in fee, then the authorities unanimously hold that there is no implied covenant of warranty, but that such covenant must be expressed in the deed. But, also, on the other hand, if the title passes an estate for years, with a reversion to the lessor, then there need be no express warranty of title or for peaceable and quiet enjoyment of the demised premises, but such covenant is implied in law. Where the lease contains such language as the one we have here, which says, " have granted, demised, leased and let, and by these presents does demise, grant, lease and let unto the party of the second part," it is universally held that there is an implied covenant of title for quiet and peaceable enjoyment for the purposes of the lease, when there is no statute restricting or qualifying the meaning of such words. This is not an open question in this State. In the case of *Knotts et al* v. *McGregor*, 47 W. Va., 566, this is held to be the law, wherein it is said: "In a lease for oil and gas, there is an implied covenant of right of entry and quiet enjoyment for the purpose of the lease." " With respect to estates less than freehold, covenants for title were from the earliest times implied not only from the words of leasing, 'such as *demisi, concessi*, or the like,' but even from the relation of landlord and tenant, and such is the law at the present day, unless where, as in some of the United States, it has been altered by legislation." Rawle on Covenants, (5th Ed.), section 272. In 18

Am. & Eng. Ency. Law. (2d Ed.), 612, it is said: "It is a well settled rule at the present time that the law will, in the absence of any express covenant, imply a covenant on the part of the lessor for the quiet enjoyment of the premises by the lessee." And we find, in *Black* v. *Gilmore*, 9 Leigh 446, that while the court did not expressly say that words of a lease imply a covenant for quiet enjoyment and good title, yet it held that where a conveyance is of a grantor's estate, words of a lease do not amount to a covenant for quiet enjoyment, and in the discussion of this question, the distinction is drawn that where the conveyance is of the fee, that no implied covenant arises, but otherwise where it is a demise for years, and passes an estate less than the fee. To the same effect is *McClellan* v. *Gwynn*, 3 Munf. 556, the second point of the syllabus being: "Where a lease is assigned, and the assignee is evicted, through a defect in the lessor's title, he may sue the lessor for compensation." Mr. Minor, in his work, second volume, at page 707, says: "A warranty is implied wherever, upon the conveyance of a *freehold*, there is a *reversion in the grantor* and the land is held of him." And we find in Lomax Digest, vol. 2, pp. 320-321, treating of this subject: "Lord Coke says, if a man make a lease for life by the word *dedi*, reserving rent, and adds an express warranty, it will not take away the warranty in law; for the lessee will have his election to vouch by force of either of them. The doctrine of implied warranties still exists where estates tail or for life are created by the word *dedi* or give; and the donor does not part with the reversion. * * * Words of a lease, in consequence of a freehold estate (it would be otherwise in the conveyance of a term for years) do not amount to an implied warranty." And on page 329: "There are some words which, when used in particular contracts, will create a covenant. Thus the words grant or demise, in a lease for years, create a covenant in law for the quiet enjoyment of the lands demised, during the term. And if the lessee be evicted by the lessor, or by any other person claiming a lawful title to the land, he may bring an action thereupon." "The words 'grant' and 'demise' in a lease for years create an implied warranty of title and a covenant for quiet enjoyment." *Scott* v. *Rutherford*, 92 U. S. Rep., 107. In *Barney* v. *Keith*, 4 Wend., (N. Y.), 502: "If an

*estate for years* be granted by an indenture of lease, the words 'grant and demise' import covenants of warranty and for quiet enjoyment." And in *Frost* v. *Raymond*, 2 Caines, (N. Y.), Chief Justice Kent, in an able discussion of this question, points out what words, contained in a lease, will imply a warranty of good title and for quiet enjoyment, and the words contained in the lease which we have here are embraced in his holding. And in *Tone* v. *Brace*, 11 Paige Chan., (N. Y.), 566, we find: "The provision of the revised statutes that no covenant shall be implied in any conveyance of real estate, does not extend to implied covenants of warranty as to the quiet enjoyment of the demised premises, in a lease of a term of years, creating a mere chattel interest in land. Such a lease is not, in the ordinary acceptation of the term, a conveyance of the land." And in *Kinney* v. *Watts*, 14 Wend., (N. Y.), 38, we find: "At common law certain words, when used in a conveyance of real estate, of themselves import and make a conveyance in law, as *dedi*, *concessi*, *demisi*. &c. As if a man, by deed, demise land for years, and the lessee is ousted, covenant lies upon the word *demisi*. No doctrine is more familiar or better settled." And again, we find in *Grannis* v. *Clark*, 8 Cowen's Rep., (N. Y.), 39, the same doctrine, and in speaking on the subject, the court says: "Therefore, when a man demises lands to which he has not any title, an action of covenant will lie against him, although the lessor never entered; for he is not bound to commit a trespass. * * * It is perfectly clear, therefore, that the words *demise* and *grant* import a covenant that the lessor had authority to make a valid lease of the premises." And in *Pomfert* v. *Ricroft*, 1 Saunders Rep., (Eng.), 322, it is held that in the conveyance of an estate less than a fee, as for a term of years, a covenant of title and quiet enjoyment is impliedly warranted. And in note 2 to this case we find, "As where a lesssee is ousted either by the lessor himself, or another person who has a prior title, an action of covenant lies against the lessor on the implied covenant *in law* upon the word *demise*. * * * But it is not necessary, in order to support this action that the lessee should be actually *evicted*. For the word *demise* implies a *power* to lease. Therefore, where a man demises lands to which he has not any title, an action of covenant will lie

against him, although the lessee never *entered;* for he is not bound to commit a trespass." And in *Holder* v. *Taylor*, Hobart's Rep., (Eng.), 46, the same doctrine is announced, and in note 1 thereto, it is said: "Implied covenants or covenants in law, and such as the law raises or implies, though not expressed. Thus the word *demisi* or *concessi* in a lease for years, imports a covenant on the lessor's part that he has a *power* to lease, and also for quiet enjoyment during the term; and if the lessee or his assignee be evicted by any one having title, he may maintain an action upon such implied covenant." See authorities there cited. And in the case of *Conrad* v. *Morehead*, 89 N. C. 34, the court says: "Hence it has been held, that where land has been granted for a term of years, by the words *demise* or *grant*, without any express covenant for quiet enjoyment, the lessee or his assigns, if ousted by rightful title, may sustain an action on the implied covenant that the lessor warranted that he had a good title at the time of the execution of the deed creating the lease. This is because the word *demise* implies the power of letting, as the word *grant*, that of giving. And in *Lovering* v. *Lovering*, 13 N. H. 518, in speaking upon this subject, the court says: "All covenants between lessor and lessee are either covenants in law, or express covenants. Illustrations of this class are to be found in the effect of the words *grant*, *demise*, etc., from which the law implies a covenant that the lessee shall hold and enjoy the term against all lawful incumbrances." And in Wisconsin, in *Eldred* v. *Leahy*, 31 Wis. 546, it is said: "At common law, a covenant for quiet enjoyment is *implied* in every mutual contract for the leasing and demise of land, by whatever form of words made." Also, in *Maeder* v. *City of Carondelet*, 26 Mo., 112, it is declared that "although a covenant for quiet enjoyment is implied from the word 'demise,' in a lease, this implication will not be raised where it is expressly stipulated in the lease that nothing therein contained shall be construed to imply a covenant for quiet enjoyment." In *Dexter* v. *Manley*, 58 Mass. 14, we have the same doctrine, and in *Young* v. *Hargrave*, 7 Ohio 394, we find: "In a lease for life, containing no express covenant for quiet possession, no word but *dedi*, I give, can be held to imply such warranty."

Now, then, we find that in a conveyance of an estate less than a fee, as for a term of years, that a covenant of warranty of title, and for quiet and peaceable enjoyment, is implied.

Then the question is, does the lease convey a fee simple estate, or an estate for years? This is the ordinary oil and gas lease, with a reversion to the grantors, for the purpose of mining and operating for oil and gas, laying pipe lines, building tanks, stations and structures thereon, and, in consideration thereof, to pay as royalty a one-eighth part of all the oil produced and saved from the leased premises. While we have some cases which may be construed to hold that the ordinary oil lease, investing the lessee with the right to remove all the oil, in place in the premises, in consideration of a certain stipulated royalty, is, in legal effect, a sale of a portion of the land, yet these cases do not conform to many others, which treat such contracts only as leases, and a conveyance for a term of years, and not to pass an estate in fee. We do not think the lease in question can be so construed as to be other than a contract which passes only an estate for years. "A lease is a contract for the possession and profits of lands and tenements on the one side, and the recompense or rents on the other, or, in other words, a conveyance to a person for life, years or at will, in consideration of a rent or other recompense." 18 Am. & Eng. Ency. Law, (2d Ed.), 597. And a lease is defined to be, by Blackstone, properly a conveyance of lands or tenements in consideration of rent or other recompense, made for life, for years or at will, but always for a less time than the lessor hath in the premises, because if it be for the whole interest, it is more properly an assignment than a lease. In fact, there is no difficulty in determining the requisites of a lease. There is no difference of opinion as to that; the definitions are uniform, but the difficulty is in always determining whether or not the particular paper or contract falls within the definition. Apply the definition to the contract here, and we find that it falls clearly within the true meaning of the word lease. It conveyed an estate less than the lessor had in the premises; it was to remain in force for the term of three years from its date, and as long thereafter as oil or gas, or either of them, was produced from the premises by the lessees;

it contained the usual words essential to its operation, which are, grant, lease and let; it gives to the lessees the right to the possession of the lands for oil and gas operations, with the profits derived therefrom, and, on the other hand, the lessor is to be recompensed by his receiving a certain part of the production as royalty. It cannot be said that the provision in the lease, which says that it shall remain in force as long after three years as oil and gas, or either, is produced by the lessee, can be so construed as to detract from it the essentials of a lease, and make it such a conveyance as to pass the whole estate to the lessor. This is an optional provision, and there is a clause in the lease reserving unto the lessees the right to surrender the lease for cancellation at any time.

Therefore, Thomas J. Headley, the father of Mansfield Headley, having, in his life time, conveyed to the South Penn Oil Company and to Loomis, a one-half of the oil and gas underlying the forty-six and twenty-four acres, respectively, and which should be construed to be one-half of the prevailing one-eighth royalty, and Mansfield Headley having leased to Hoopengarner, Wharton, Karnes & Co., the remote assignors of the defendants, his interest in the seven-eighths of the oil and gas underlying the seventy-acres, reserving one-fifth of the one-eighth royalty, would be liable on his warranty to Hoopengarner, Wharton, Karnes & Co., or those claiming under them, but just to what extent, it is not necessary to determine, for reasons hereinafter appearing; nor is it absolutely necessary for the decision of the case to construe the conveyance from the Headley heirs, and to determine whether or not it contains implied covenants of title and quiet enjoyment, but this question is presented by the record, and it is proper and just that it should be considered and determined; and to decide it is only to give two reasons instead of one why Mansfield Headley is not entitled to the relief he asks. The doctrine of estoppel is invoked, and this is the additional reason for denying the plaintiff relief. All the parties who at that time were interested in the oil and gas underlying these two tracts of land, signed division orders, of date April 17, 1900, and August 9, 1900, respectively, agreeing to a division of the oil and gas, and directing how it should be distributed, and by doing so, have contracted in

regard thereto, and thereby adjusted and settled the amount
to be received by them, respectively, prior to the signing of
these agreements and stipulations, and as to how it should be
divided in the future.    This amounts to a construction of the
contract by the parties thereto, and those interested therein.
These division orders were signed by all the interested par-
ties, including the assignors of the defendants, Goodkind &
Kleeberg, and the Colonial Oil Company.    Goodkind & Klee-
berg purchased the working interest in this lease, and received
a conveyance therefor on the 21st day of December, 1900,
and the Colonial Oil Company purchased from Goodkind &
Kleeberg the working interest on the 7th day of January,
1902.    Both interests were acquired subsequent to the time
of the execution of the division orders.    These purchases by
Goodkind & Kleeberg and the Colonial Oil Company were
made with the full knowledge of the existence of these
division orders.    They knew that the parties had agreed
among themselves as to their respective interests, and, acting
upon this, they became the purchasers of the property, and
having so acquired these interests, they cannot now be preju-
diced by Mansfield Headley asserting a greater interest than
that which he stipulated for in these contracts, and which
they believed he had at the time they acquired the property.
It would be a fraud upon their rights to permit him to do so.
Having made the agreement, to accept one-fifth of one-six-
teenth of the royalty oil, he will not be permitted, after the
defendants have acted upon the agreement, to assert that he
is now entitled to one-fifth of one-eighth thereof.    Plaintiff
says that the defendants, Goodkind & Kleeberg and the
Colonial Oil Company, knew that by the requirements of the
decree they were required to pay the one-eighth of all the
oil as royalty; that the title papers, in plain language, told
them so; that when they took an assignment of the deed from
the purchasers they were bound to know the contents of their
title papers, and that those papers told them that the Head-
leys must be paid one-eighth of the royalty; and when the
first division order was signed, Snyder had actual notice that
there was an outstanding royalty in South Penn Oil Company
and Loomis, and their title papers told them that one-eignth
should be paid to the Headleys, and if Goodkind & Kleeberg
and the Colonial Oil Company had looked to their title papers,

which they were bound to do, they would have known the facts regarding the title.    It may be true that they could have ascertained, by an examination of the lease and the title papers, that the Headleys were to receive a one-eighth of the oil as royalty, but they are not called upon nor required to go further than the contract made by all the parties interested in the division of the oil.    Equity did not require them to search the records, nor even look to the lease, to see what interest Headleys had, when the contract itself expressly represented and told them what that interest was.    No one will doubt the right of Headley to have contracted with reference to his interest.    He did contract with reference to it, and by his contract he must now stand.    He cannot be heard to say: "Yes, I did contract to receive a one-fifth of one-sixteenth, but I now repudiate that contract, and I assert that I am entitled to one-fifth of one-eighth, and that the Colonial Oil Company must pay that amount to me, notwithstanding the fact that in making the purchase of the seven-eighths working interest they knew of the existence of my contract; knew what I had agreed to accept, and knew all the conditions in reference to the division of the oil."    The case of *Brant* v. *Va. Coal and Iron Co.*, 93 U. S. Rep. 326, is cited, and relied upon, but it is not an analogous case.    The defendant company was not destitute of knowledge of the true state of Mansfield Headley's title, but it may and could have known of the condition of the title, and that the lease to Hoopengarner, Wharton, Karnes & Co. reserved a one-eighth royalty, yet it cannot be said that Mansfield Headley could not contract with reference to that royalty interest, by compromise, by sale, or in any other way, and when the defendants find in existence a contract by which the plaintiff has dealt with his interest, and in which it is definitely stated, then, notwithstanding the lease and title papers may represent his interest to be one-fifth of one-eighth, they may presume that this interest has, in some way, been changed by this contract or division order, and may act upon this presumption without making further inquiry as to the interest of the parties signing the contract, and the plaintiff will be estopped from asserting, to their detriment, an interest greater than that for which his contract provides.

2d vol. Pomeroy's Equity Jurisprudence, section 810, says:

"It has been said that in alleged cases of estoppel by conduct affecting the title to land, the record of the real title would furnish a means by which the other party might ascertain the truth, so that he could not claim to be mislead, and could not insist upon the estoppel." "This conclusion," says Mr. Pomeroy, "if correct at all, is correct only within very narrow limits, and must be applied with the greatest caution. It must be strictly confined to cases where the conduct creating the estoppel is mere silence. If the real owner resorts to any affirmative acts or words or makes any representations, it would be in the highest degree inequitable to permit him to say that the other party who had relied upon his conduct and been misled thereby might have ascertained the falsity of his representations." Therefore, when the Colonial Oil Company saw the division order, setting forth what had been agreed upon between the plaintiff and the other interested parties, they were not required to probe into the matter and find out just how and upon what consideration, and for what reason, the contract was entered into. If the lease did provide for one-fifth of one-eighth royalty, and the contract between the parties provided for one-fifth of one-sixteenth, they had the right to presume that there had been some negotiations or dealings between the parties, by which his interest had been reduced from one-fifth of one-eighth to one-fifth of one-sixteenth.

There are two kinds of estoppel by contract—one where the party is estopped to deny the truth of the facts agreed upon, and settled by the terms of the contract, and the other is an estoppel arising from the acts done under or in performance of the contract. "If in making a contract the parties agree upon or assume the existence of a particular fact as the basis of the negotiations, they are estopped to deny the fact so long as the contract stands." 16 Cyc. 719; *Grand Rapids Fourth Nat. Bank* v. *Onley*, 63 Mich. 58. The plaintiff worked on the lease, and after oil was found, he was the first one to inform the lessees of the interest of the South Penn Oil Co. and Loomis, and when this information was received, the said division orders were signed, directing the Pipe Line Company to divide and distribute the oil in certain proportions to the interested parties, and under and in compliance therewith, the company distributed the oil for several

years without complaint upon the part of anyone; yet Mansfield Headley knew all that was going on, and exactly in what proportions the oil was being distributed, because his contract plainly told him so, and he must know its contents, and will not be heard to say, as he does, that at the time he signed the orders, he did not know his rights in the premises, but thought he was getting all that he was entitled to under the lease. This is hardly tenable, even if he could now make such claim. When he says his contract was that the heirs were to have one-eighth of the production, we cannot conclude from all the facts and circumstances that this is so, especially in view of the division orders, and he having acquiesced in the distribution of the oil thereunder for about three years, and most especially when the rights of third parties would be affected thereby. While the division orders were directed to the Pipe Line Company for the purpose of having the oil distributed to the parties in proportion to their relative interests represented therein, yet they should be treated, certainly for the purposes of this case, as fixing and representing the true interests of the parties thereto. If not a contract binding the parties, then what was the purpose of its execution? It was intended by the parties to serve some lawful purpose. Of course, they would be a protection to the Pipe Line Company, and if so, we should carry it further, and hold it to be a binding stipulation, shaping the interests of the parties, especially third persons contracting with reference to these interests therein defined and fixed.

Estoppel by contract is a term which is intended to embrace all cases in which there is an actual or virtual undertaking to treat a fact as settled, as for example, a contract based upon one's having a certain title to property, will estop the parties in the performance of the contract from claiming a different title. "The estoppel in this class of cases is fixed by the execution of the contract; nothing further need be shown, where the fact in question is clearly agreed or assumed." Bigelow Estoppel, (5 Ed.) 460.

This brings us to the consideration of the interests of the infants. The lease which was made by Mansfield Headley and the widow, and LeMasters, as guardian of the infant heirs, on the 17th day of March, 1899, having been made by the guardian leasing the infants' interests, without authority

of the court having been first obtained, by proper judicial
proceedings, is admitted by all to be inoperative and void as
to the infants, and only served to pass the interest of Mans-
field Headley and the widow.     This being so, summary pro-
ceedings were instituted by LeMasters, the guardian, for the
purpose of disposing of the oil and gas of the infants in the two
said tracts of land.    Such proceedings were had therein, as
resulted in a sale to Hoopengarner, Wharton, Karnes & Co.,
the same persons to whom the former lease, of date March
17, 1899, had been given, and upon the same terms.    No
question is made as to the regularity of the proceedings un-
der which this sale was made.    But it is claimed that as
Thomas J. Headley, in his life time, had disposed of one-
sixteenth of the oil production, that the four infants are only
entitled to four-fifths of one-sixteenth thereof, and that the
lessees should be protected under the covenants of general
warranty of title in the deeds from the ancestor, Headley, to
the South Penn Oil Company and Loomis, and only required
to pay the one-half of the royalty to the South Penn Oil
Company produced from the forty-six acre tract, and to
Loomis one-half of the production from the twenty-four
acres, and to Mansfield Headley one-fifth of one-sixteenth,
and to the infants four-fifths of one-sixteenth of the royalty,
and to require them to pay one-eighth royalty, to the heirs
will be to demand of them three-sixteenths royalty, when,
under their contract, they should pay only one-eighth royalty.
The decree authorizing the guardian to sell the undivided in-
terest of the infants to the oil and gas, provided that in ad-
dition to a certain bonus they should receive four-fifths of
one-eighth of all the oil produced, and under the decree the
lessees purchased, agreeing to pay them the four-fifths of
one-eighth, and a deed was made to them, in conformity
therewith.    There is no warranty in this conveyance, except
a special warranty, as provided by section 17, chapter 83, of
the Code, and by the terms of this decree, and deed made in
pursuance thereto, there was passed to the vendees the seven-
eighths working interest in the oil and gas, reserving to the
infants four-fifths of one-eighth of the entire production.    It
was sold upon these terms, and this is the plain construction
of the deed.    This sale being a judicial sale, the rule *caveat
emptor* applies, and although the title fails or the lessees may

not get as much oil as they thought they were purchasing, they will not be relieved from the payment of the consideration. The court sold just such title as was vested in the infants, could have sold nothing else, and the purchasers were bound to know this. They purchased at their own risk, and are held to know the source and condition of the title. In this character of sales there is no warranty, except special warranty, before referred to. In *Williamson* v. *Jones*, 43 W. Va. 563, it is said: "A purchaser at a judicial sale is conclusively held as having notice of all facts touching the rights of others in the property sold, disclosed by the record of the case," and JUDGE BRANNON, speaking for the Court, says: "Prudence would make a man inquire where the real estate in the land was. A purchaser at a court sale purchases under the rule *caveat emptor* (look out, buyer). The court or commissioner warrants nothing." Apply this doctrine, and the lessees are conclusively held to know that the South Penn Oil Company and Loomis held title to one-sixteenth of all the oil produced on this land. But even ignorance will not give relief or excuse from payment of the purchase money. "The purchaser's ignorance that a particular instrument forming a link in his chain of title was in existence, and his consequent failure to examine it, would not in the slightest, affect the operation of the rule. An imperative duty is laid upon him to ascertain *all* the instruments which constitute essential parts of his title, and to inform himself of all that they contain." Pom. Eq. Jur. (3rd Ed.), section 626, and many cases cited. *Capehart* v. *Dowery*, 10 W. Va. 130. Objection after confirmation of sale comes too late. "In Virginia the maxim *caveat emptor* strictly applies to all judicial sales. Objection for defect of title must be made before confirmation of report of sale." *Hickson* v. *Rucker et al.*, 77 Va. 135; and to the same effect is *Long* v. *Weller*, 29 Grat. 347. And in *Cooper* v. *Hepburn*, 15 Grat. 551, it is held that where a court directs a sale of infant's real estate, and the sale is made and confirmed, that the purchaser stands upon the same footing as any other purchaser at a judicial sale, and is not entitled to any other or further relief. "The purchaser at a court sale buys at his own risk—under the rule of *caveat emptor* (let the purchaser take care). The court ordering the sale, or the commissioner making it, war-

rants nothing.   A person buying at such sale, is conclusively held to have notice of all the facts which an examination of the record would have disclosed to him.   * * *   And it is the duty of the purchaser to ascertain for himself the title to the land as well as the extent thereof, and if he have just ground of objection, for want or defect of title, he should present his objections to the court before confirmation of the report of sale.   A person having purchased property at a judicial sale, and permitted the sale to be confirmed, without objection, is not entitled to be relieved from the purchase, or from paying the purchase money, though he has acquired no valid title to the land purchased by him.''   Hogg's Eq. Pro., section 687.   But the same author says this doctrine is subject to the qualification that the purchaser is entitled to relief where mistake of material facts is afterwards discovered, or fraud, but such mistake must be mutual, and if fraud or mistake be relied on by the purchaser, after the sale has been confirmed, it must be clearly and distinctly charged and proved.   Neither fraud or mistake is shown here on the part of the infants.

The appellants contend that the infants are estopped to claim more than four-fifths of one-sixteenth of all the oil produced, because two of them, who were plaintiffs in the ejectment suit, received royalties after attaining their majority, and at least three of them were past years of discretion, and also that the guardian and heirs having accepted for three years before suit brought, the amount agreed upon under the division orders, are estopped to deny the terms under which the operations were directed.   "An infant of years of discretion by intentional fraudulent conduct will be barred under the doctrine of estoppel *in pais* from asserting her title to either real or personal property against one misled thereby.''   *Williamson* v. *Jones*, *supra*.   The record fails to disclose fraudulent conduct upon the part of the infants.   We see nothing that calls for the application of the doctrine of estoppel as to them.   The fact that some of them received their share of the royalties after they had attained their majority, does not do so.   An infant may or may not, at his election, affirm or repudiate, after he attains his majority, a contract made by him during minority, and it may be if the infants were seeking to avoid the sale, that they

would not be permitted to do so if they had received the royalties after becoming twenty-one. That would be a ratification and affirmance of the contract, but very different is this case. They do not seek to avoid the sale, but are asking strict compliance therewith, according to the plain construction of the deed. The fact that they accepted a part of the consideration without any objection, or claim that more was due them, will not militate against them. The lessees knew what they were entitled to receive, and the fact that they did not pay it, and that the infants did not demand it, but accepted one-half of the amount thereof for three years, will not relieve the lessees from the payment of the remainder of the consideration. Nor will the fact that the guardian signed the division orders agreeing to take one-half of what the deed called for, estop them from now claiming their full share. Even if they had known of his having signed such orders, they could have treated them with impunity. He was not empowered to make such a contract for them, and the lessees were bound to know this, and knowing that he was acting without authority and in excess of his powers, they cannot claim the advantage of such conduct to the detriment of the infants.

Having held that there is an implied covenant for title and quiet enjoyment in the lease made by the Headley heirs, in which Mansfield Headley passed his interest. and having determined that the infants are entitled to four-fifths of the one-eighth royalty, it may be asked, what is the extent of the liability of Mansfield Headley on his implied warranty, that is, should it be treated as several, or joint and several; but, as before stated, it is not material, because, in signing the division orders, the lessees arc bound thereby, as well as the plaintiffs. They recognize, in these orders, his interest to be one-fifth of the one-sixteenth royalty, have acted upon them for years, and are now claiming under them, and if binding upon Headley, they must also bind the lessees, and they are concluded from saying otherwise.

The appellants further claim that under the authority of *Ammons* v. *Ammons*, 50 W. Va. 405, all parties should have been convened, and all questions affecting the royalty settled, and that they should have a decree for the seven-eighths they purchased. In that, as in this case, there was a summary

proceeding to sell infants' lands, but there the court decreed that the purchaser should pay one-half the royalty to the life tenant, and one-half to the infants. Afterwards, this Court, in *Wilson* v. *Youst*, 43 W. Va. 286, having decided that the life tenant is only entitled to the interest on the royalty during the continuance of the life estate, and that the residue or corpus of the royalty will be paid to the remaindermen, the South Penn Oil Company, the purchaser, declined to make further deliveries of the royalty oil, and filed its petition for the purpose of having the purchase money distributed, and to that end asked that the decree should be corrected, on the ground that the summary proceedings were not in conformity with the statute, and so erroneous as to becloud and endanger its title. And it was held by this Court that the purchaser could file his petition in said proceedings, for the purpose of having such error corrected, and its title cleared, and have relief given so far as within the power of the court. This proceeding was based entirely upon the irregularity of the summary proceeding, and the irregular manner in which the proceeds arising from the sale were being distributed. There was no controversy as to the interest held by Armina Ammons and Milton A. Ammons, guardian for the infants, Armina Ammons owning the life estate, with the remainder to the infant children, and this being so, the court decreed the royalty oil to be divided equally, one-half to the life tenant and one-half to the infant remaindermen, and, therefore, under the doctrine of *Wilson* v. *Youst*, *supra*, the South Penn Oil Company asked to have the proceedings corrected so as to have a proper distribution of the royalty. This was perfectly proper, because the respective interests in the property being undisputed, it was then a matter of law as to whom the royalty should be paid, and if, in the summary proceedings, to which they were all parties, an improper order as to its distribution was made, it was right and proper to correct it. But very different is this case—the regularity of the summary proceedings and decrees, under which the sale was made, is not questioned. The guardian was directed, by the decree, to make sale upon certain terms, and by the provisions of this decree he should have been and was guided, and when the sale was made, the purchasers agreed to pay four-fifths of one-eighth

of all the oil produced. This sale was confirmed by the court, and a deed made in accordance with the provisions thereof, and now that this has been done, the purchasers cannot have these proceedings and decrees opened, because they are final and conclusive upon them.

The plaintiff assigns as cross error that the court erred in perpetuating the injunction enjoining the prosecution of the ejectment suit of Elisha LeMasters, guardian, and others, against the Colonial Oil Company. This is based upon the fact that the lessees failed to pay the full share of the royalty to the infants, to which they were entitled. While there is a provision in the deed made by the guardian in the summary proceeding, to the effect that a failure to comply in all respects with the terms and stipulations of the deed, would work a forfeiture, and that the property would revert to the heirs, there is no claim that the lessees have failed, in any respect, to comply with the contract, except as to the payment of four-fifths of one-sixteenth of the oil production, and this was because of the complications which gave rise to this litigation. They placed a different construction upon the contract. from that given it by the heirs, and have so confided in their construction as to litigate it through this Court for decision. This is not such a voluntary and wilful failure and refusal to comply with its provisions as should work a forfeiture of the estate acquired under the deed. It appears from the record that. their failure to pay must have been in good faith, relying upon their construction of the deed. To impose a forfeiture is a harsh penalty, and courts are slow to do so, except where it is plainly demanded. While the common law courts recognize and will enforce forfeitures in proper cases, yet courts of equity will never do so, but, on the contrary, will relieve against them. It is said in *Craig* v. *Hukill*, 37 W. Va., 523, "Affirmative relief against penalties and forfeitures was one of the springs or fountains of equity jurisdiction, and the jurisdiction was very early exercised; and it would be going in the very opposite direction, and acting contrary to its essential principles, to affirmatively enforce a forfeiture. The. elementary books on equity jurisprudence state the rule as almost an axiom, that equity never enforces a penalty or forfeiture." 2 Story Eq. Jur., section

1319; 1 Pom. Eq. Jur., section 459; Bisp. Eq., section 181; Beach, Mod. Eq. Jur., section 1013. And, also, it is said in *Hukill* v. *Myers*, 36 W. Va. 645: "Courts of equity were originally founded, among other purposes, to relieve against the hardness of courts of common law, and notably to relieve against forfeiture, even where it clearly exists; and very safely it can be said that equity looks with disfavor upon forfeitures, and will not be quick, active, or alert to see or declare or enforce them." The infants have, at all times, had their remedy for pecuniary reimbursement. And not only that, but they are now in this suit, asking that the lessees be compelled to pay the back royalties, and have their future interests determined. They certainly cannot claim under the deed future royalties, and at the same time claim the benefit of a forfeiture. This would be extremely inconsistent, and not to be countenanced. Therefore, even if a violation of the provisions of the deed would forfeit the estate, yet under the facts of the case, there is no forfeiture, and the prosecution of the ejectment suit was properly enjoined.

The South Penn Oil Company cross assigns error. There is no question but what it is entitled to one-sixteenth of all the oil produced on the forty-six acre tract, and that Loomis is entitled to one-sixteenth of all the oil produced from the twenty-six acre tract. There is no controversy as to this, but the lower court failed to so provide, which it should have done.

The infants are entitled to have an accounting for their full share of four-fifths of one-sixteenth of the royalty oil since the first production, in addition to the four-fifths of one-sixteenth which they have already received, this interest, of course, being subject to the widow's dower; and, inasmuch as there have been various assignees of the lease since the first production of oil, the decree of the circuit court is reversed, and this cause is remanded, to be proceeded in and determined according to the principles herein announced, and according to the rules and principles governing courts of equity.

*Reversed.    Remanded.*