J. B. GATHRIGHT LAND CO. v. KENTUCKY-WEST VIRGINIA GAS CO. et al.

No. 6261.

Circuit Court of Appeals, Sixth Circuit.

July 3, 1933.

J. W. Stites, of Louisville, Ky. (Trabue, Doolan, Helm & Helm, of Louisville, Ky., on the brief), for appellant.

Allen Prewitt, of Frankfort, Ky. (A. J. Findley, of Sistersville, W. Va., and Edward C. O'Rear, of Frankfort, Ky., on the brief), for appellees.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

The suit below was by the lessor (here the appellant) to cancel an oil and gas lease entered into with the assignor of the appellees. Questions are presented relating to the construction of certain provisions in the lease, and to the equitable rights of the assignees. The facts are not in dispute, and their arrangement in chronological order will the better aid understanding of the legal issues involved.

The lease was made by the plaintiff with one Frank B. Russell on December 9, 1924, and covered 4,344 acres of land in Owsley and Jackson counties in the Eastern District of Kentucky. The term was for one year and six months, and "as long thereafter as oil and gas, or either of them is produced from said premises, or in any parcel or part thereof by the lessee, his assigns or successors." The lessee covenanted to drill three wells, the drilling to begin within four months from the date of the lease, to deliver to the credit of the lessor in the pipe line to which the lessor or his assigns might connect the wells, one-eighth part of all oil produced and saved from the premises, and to pay $100 per year for gas from each well where gas is found when the same is transported and sold off the premises, or otherwise commercially utilized. The lease also provided for successive periods of extension in the event that the three wells proved dry. With the last provisions we are not concerned.

Russell began drilling within four months of the signing of the lease, and completed three wells before the expiration of the one-year and six months period. The first two were dry, but the third had an open flow capacity of 2,500,000 cubic feet of gas per day, and constituted a paying or commercial well. In the drilling of the three wells Russell expended about $11,500. There being no neighboring market for the gas found, and the construction of a pipe line to Lexington, 90 miles away, being commercially impracticable, Russell capped the well to preserve the gas. Upon the discovery of gas, Russell paid the plaintiff $100 on account of this well for the year beginning June 9, 1925, and again on June 9, 1926, for the year beginning on that date. These payments were accepted by the plaintiff. In the meanwhile Russell had assigned his lease to the Louisville Gas & Electric Company, which company on June 9, 1927, paid the plaintiff $100, which carried the royalty up to June 9, 1928. This payment was also accepted by the plaintiff.

Shortly before November, 1928, after holding the lease for upwards of two years, the Louisville Gas & Electric Company as-

signed it to the Kentucky-West Virginia Gas Company, one of the defendants, for a consideration of $25,000. Meanwhile it had sent a check to the plaintiff for royalty for the year beginning June 9, 1928. This check the plaintiff did not cash, but retained it without objection until November 24, 1928, when it returned the check to the sender. Whether or not the plaintiff knew of the assignment by the Louisville Gas & Electric Company to the Kentucky-West Virginia Gas Company at the time the check was returned does not appear, although the District Judge felt it not unlikely that the plaintiff had heard of the assignment. In returning the check, it gave as its reason that the lease had terminated on the expiration of the eighteen-month period because the gas which had been found was not transported or otherwise commercially used, but remained confined, and it demanded that the Louisville Gas Company vacate the property and redeliver possession to it within thirty days. The gas company, having assigned the lease to the Kentucky-West Virginia Company, transmitted the plaintiff's letter to it, and on December 1, 1928, the latter company notified the plaintiff that the lease was in full force and effect, and that it would not vacate.

Nothing further happened until May 28, 1929, when the defendant Kentucky-West Virginia Gas Company mailed its check to the plaintiff for $100 for the 1929 royalty. Nothing had been heard from the plaintiff concerning this check, when on August 24, 1929, the Kentucky-West Virginia Gas Company assigned the lease to Petroleum Exploration, defendant, for $10,000 in cash. September 9, 1929, the Kentucky-West Virginia Company notified the plaintiff of this assignment, and returned to it its check for the 1928 royalty. On September 17, 1929, plaintiff returned this check and also the check for the 1929 royalty, which it had retained since May, 1929, and on the same date notified defendant Petroleum Exploration that it claimed the lease was void.

At the time gas was found in the third well by Russell the nearest market for it was at Lexington, Ky. It could only be delivered there by the construction of a pipe line, which would cost $750,000. There was no other developed or proved territory in the region to help out in the building of such line. While Petroleum Exploration had a pipe line reaching from Idamay in Lee county to Lexington, this was a private line, and neither Russell nor his subsequent assignees, the Louisville Gas Company or the Kentucky-

West Virginia Gas Company, had any right of access to it. When, however, Petroleum Exploration acquired the lease in 1929, it at once began the construction of a pipe line connecting the leased premises with the terminus of its pipe line at Idamay, and completed it November 26, 1929, when it began to market the gas from the defendant's premises, and has continued to do so ever since. About a year after the connection was completed, to wit, October 2, 1930, this suit was brought to cancel the lease.

The first question presented involves the meaning of the phrase "produced from said premises" in the extension clause of the lease. The plaintiff contends that there can be no production from the premises unless the gas is commercially utilized thereon, or transported from the premises. The defendant vigorously challenges this construction. It urges the view that the gas is produced from the premises when it is brought forward to view or notice from the place where it is found. This is the interpretation that the District Court put upon the phrase. It is to be noted that most oil and gas leases which contain extension agreements use the terms "when gas is found" or "when gas is found in paying quantities." Whether these phrases are synonymous with the phrase in the present case, and, if so, whether the last is qualified by the provision obligating the lessee to pay royalty for gas only "when the same is transported and sold off the premises or otherwise commercially utilized," and whether the construction put upon the extension clause below is correct, we do not feel obliged to decide for reasons which will presently appear.

In White v. Green River Gas Co., 8 F. (2d) 261, 264, a substantially similar oil and gas lease was before this court for interpretation. There, as here, oil was not found, but gas was. There, as here, the lessee paid, and the lessor accepted, rental or royalty beyond the fixed exploratory period. There was this difference in the relief prayed for: The plaintiff there asked for cancellation of the lease only in so far as it covered the undeveloped part of the premises, although later he tried to get into the court below by supplemental bill to cancel the entire lease. Here the lessor seeks cancellation of the entire lease from the beginning. In the White Case the court said: "But a court of equity is not required to decree a cancellation of the entire lease, if by doing so the lessee would be deprived of valuable property, and the lessor obtain an unconscionable advantage."

And again: "Having accepted rentals on these two wells after the expiration of the term named in the lease, it would be inequitable to deny the right of the lessee to market this gas from these wells as long as lessee continues to pay the rentals." The same case was again before this court in White v. Dawson, 18 F.(2d) 471, upon an application for mandamus directing the District Judge to entertain the supplemental bill. To the prayer of the petition asking that the intent and effect of the former opinion be elaborated, Judge Denison said: "At the time the bill was filed the lessee was not obliged to pay further rental, because no gas was being sold off the premises; but this was the lessee's privilege. He waived it and continued to pay, and the lessor accepted such payments carrying the extension rights up to April, 1923. Before the case was disposed of below, gas was being sold from these two wells. Hence this two-well lease could be continued in force at the will of the lessor, as long as gas continued to be 'sold off the premises,' and at the will of the lessee, as long as it paid pursuant to that condition or chose to waive the condition and pay anyhow."

Whether in the present case we consider the payments made by the lessee and his successive assignees as mere gratuities, as stated in White v. Green River Gas Co., or whether, giving consideration to the distinguishing circumstances noted by the District Judge, we consider them as payments of rent following an effectuated extension of the lease, or arrive at an interpretation of the extension clause based upon a practical construction put upon it by the parties themselves, the result must be the same if we are under the first view to make the same application of equitable principles as was made in the White Case. It may be said parenthetically that the equities of the defendants are here much stronger than there.

While in the White Case the lessor sought in the first instance only a cancellation of the lease upon the undeveloped portion of the leased premises, and in this position was sustained, the lessor here, as already noted, seeks not a cancellation of part of the lease, but the whole of it. We are therefore not called upon to consider in what respect the lease requirements for further development differ in this case, if at all, from those in the White Case, and it may well be that the plaintiff here, not succeeding in canceling the entire lease, may desire no partial cancellation. It must follow in this situation that no cancellation will be granted.

The decree below is affirmed.